3 September 1999

NO. 4-99-0071

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

RANA McARTHUR, f/k/a/ RANA KING,        )   Appeal from

Individually, and as Special            )   Circuit Court of

Administratrix of the Estate of         )   Macon County

BABY BOY KING, Deceased,                )   No. 97L97

Plaintiffs-Appellants,        )

v.                            )   Honorable

ST. MARY'S HOSPITAL OF DECATUR,         )   James A. Hendrian,

Defendant-Appellee.           )   Judge Presiding.

_________________________________________________________________

PRESIDING JUSTICE KNECHT delivered the opinion of the court: 

Plaintiffs, Rana McArthur, individually and as special administratrix of the estate of Baby Boy King, deceased, appeal from an order of the circuit court of Macon County granting sum­

mary judgment to de­fendant, St. Mary's Hospital of Decatur (hos­

pital), as to paragraphs 6(b) through 6(h) of count V of her third-amend­ed com­plaint.  For the reasons that follow, we re­verse the judgment of the trial court and remand for further pro­ceed­

ings. 

The facts necessary to our resolution of this appeal are not in dispute.  Dr. William Wagner provided Rana McArthur's pre­natal care at the hospital's prenatal clinic.  On Sep­tem­ber 18, 1995, in the twentieth week of the pregnancy, Dr. Wagner ordered a com­plete pregnancy ultrasound examination.  A hospital-

employed technician performed the exam­ination.  Perma­nent re­cord­

ed images were made of various anatomi­cal structures.  These images were reviewed and interpreted by Dr. J. Ambrosini, a radi­-

ologist who contracted with the hospital to provide radiolog­ical services.  Dr. Ambrosini testified at his deposition it was the poli­cy of both the hos­pi­tal and Dr. Ambrosini's medical group that the hospital's tech­ni­cian had the responsibility to mea­sure the cere­bral ventri­cles and inter­pret those measure­ments.  The tech­ni­cian who per­formed the exam­i­na­tion for plain­tiff found nothing abnor­mal about the ven­tri­cles.  Plaintiffs were aware a hospital techni­cian took the sonogram but the ultrasound report indicates it was interpreted by Dr. Ambrosini.  Dr. Ambrosini did not per­form his own inde­pen­dent as­sess­ment of the ventricles.    

Plaintiffs allege the cerebral ventricles had begun to dilate or fill with an abnormal amount of fluid by the time of the ultrasound.  When the cerebral ventricles fill with fluid,  they have measurements larger than normal for the gesta­tion­al age in question.  The filling of the cerebral ventricles marks the  be­gin­ning of the de­vel­op­ment of hy­dro­ceph­a­lus, a condition char­acterized by an en­larged head on the baby.  The hydrocephalus went undi­agnosed and contin­ued to develop without the knowledge of Dr. Wagner.

On January 7, 1996, plaintiff mother experienced moder

ate con­tractions and went to the hospital to determine wheth­er she was in labor.  Apparently it was a false labor and she was sent home.  While in the hospital, however, a sonogram was taken by Dr. L. Walton, the obstetrician on call.  Dr. Walton indicated the baby was in a breech position but stated noth­ing more.

Plaintiff mother returned to the hospital on January 18 to de­liver her baby.  Dr. Wagner ordered a flat plate X ray to de­ter­mine whether the baby was still in a breech position.  The 

X ray was taken and developed by hospital employees.  Dr. Wagner testi­fied he was informed by a nurse the X rays indicated the baby was still in a breech position.  The X-ray report was made the next day after the radiologist, Dr. T. Ferry, read the 

X rays.  Dr. Wagner testified he first saw the X-ray re­port the day after delivery.

Dr. Wagner spoke with plaintiff mother and elected to do a vaginal delivery instead of a cesarean-section delivery.  During the de­liv­ery the baby's legs, trunk, and shoulders were delivered with­out inci­dent but, because of the abnormally large size of the baby's head caused by the hydrocephalus, the head became trapped in the birth canal causing the umbilical cord to compress, and the baby died.  Both Dr. Wagner and plaintiff mother testified this was the first time either was aware hydro

cephalus was pres­ent.

Plaintiffs brought suit against the hospital and sever­

al other defendants on May 23, 1997.  The only allega­tion against the hospital in the orig­i­nal com­plaint was that on or about Janu­

ary 7, 1996, it "[f]ailed to implement and/or enforce a poli­cy re­quir­ing a perma­nent radio­graphic image of all ultra­sound sonogram exami­na­tions be main­tained."  The allegations against other de­fendants included the failure to correctly read the sonograms and X rays taken and the failure to diagnose the hydro­

cephalus from which Baby Boy King suffered.  A first-amend­ed com­

plaint, with the same alle­ga­tion against the hospital, was filed on Au­gust 5, 1997.  A sec­ond-amended com­plaint, again with the same sole allegation against the hospi­tal, was filed on August 25, 1997.  

Discovery proceeded among the parties.  At the February 1998 deposition of Dr. Ambrosini, plaintiffs dis­cov­ered Dr. Ambrosini never evaluated the cerebral ventricles, but he claimed a hospital technician had that responsibility.  That same month the deposition of Dr. Ferry was taken, and plaintiff learned that, al­though Dr. Ferry dictated a report containing his inter­

preta­tion of the X ray taken immediately prior to birth, he did not actual­ly see the film until the next day.  

On April 2, 1998, plaintiffs moved for leave to file the third-amend­ed complaint on April 2, 1998.  Among other things, this complaint added seven new allegations against the hospital:

"(b) Acting by and through its employee,

Connie Lanham, failed to properly read and/

or interpret the ultrasound performed on

September 18, 1995;

(c) Acting by and through its employee,

Connie Lanham, failed to appreciate and/

or document the fetus' enlarged ventricles

on September 18, 1995;

(d) Permitted and/or implemented a policy,

practice, guideline[,] or protocol which did

not require a properly qualified physician 

to interpret and/or access the cerebral ven-

tricles for congenital abnormalities during

every complete pregnancy ultrasound;

(e) Acting by and through its agents or em-

ployees, failed to timely interpret the flat

plate X-rays [
sic
] obtained on January 18, 1996;

(f) Permitted an unqualified person to in-

terpret both the September 18, 1995[,] ultra-

sound and the January 18, 1996[,] flat plate

X-ray [
sic
];

(g) Acting by and through its agents or 

employees, misread and/or misinterpreted the

radiographic films on January 18, 1996;

(h) Acting by and through its agents or 

employees, failed to note and/or document fe-

tus; hydrocephalic head evident on January

18, 1996."

Several defendants, including the hospital, objected to the court granting leave to file the amended complaint; one of the grounds asserted was that it included completely new alle­ga­

tions against them that were barred by the statute of limita

tions.  Leave to file the third-amended complaint was granted, how­ev­er, and the amended complaint was filed on June 25, 1998.  

Defendants Dr. Ambrosini and Radiological Associates of Decatur filed a motion for summary judgment arguing plaintiffs could not establish proximate causation as to them.  This motion was granted on September 29.  Plaintiffs filed a motion to recon­

sider on October 13.  The hospital filed a motion for summary judgment on October 30, adopting the proximate cause argument of Dr. Ambrosini and Radiological Associates and adding a paragraph arguing the seven new allegations against it were barred by the statute of limitations.  Before the trial court ruled on plain­

tiffs' motion to reconsider its ruling on summary judgment for defendants Dr. Ambrosini and Radiological Associates, plaintiffs settled with all defendants except the hospital.  The motion to reconsider was denied on November 17, 1998.

Plaintiffs filed a response to the hospital's motion and memorandum in support of summary judgment on December 3.  The response did not include any argument or opposition to the stat­

ute of limitations issue.  On December 22, the trial court grant­

ed summary judgment in favor of the hospital, finding the new allega­tions alleged different conduct by different people than the orig­i­nal allegations.  As such, they presented additional factual bases for the liability of the hospital and did not re­

late back to the original or previous amended complaints that were filed within the statute of limitations period.  A Rule 304(a) (155 Ill. 2d R. 304(a)) finding was made, finding no just reason to delay enforce­ment or appeal.  Plain­tiffs then filed a mo­tion to re­con­sid­er and ad­dressed the arguments regarding the statute of limi­ta­tions issue, contending the new allegations against the hospi­tal relat­ed back to those in the original or amended com­plaints filed within the statutory time period.  The motion was de­nied on Janu­ary 11, 1999, and this ap­peal fol­lowed. 

 The standard of review for the granting of a summary judgment motion is 
de
 
novo
.  
In re Estate of Hoover
, 155 Ill. 2d 402, 411, 615 N.E.2d 736, 740 (1993).  All issues of fact, plead

ings, depositions, and admissions must be construed strictly against the movant and liberally in favor of the party opposing the motion.  
Loyola Academy v. S&S Roof Maintenance, Inc.
, 146 Ill. 2d 263, 271-72, 586 N.E.2d 1211, 1215 (1992).

 The applicable statute of limitations for a medical malpractice action is found in section 13-212(a) of the Code of Civil Procedure (Code), which provides:

"[N]o action for damages for injury or 

death against any *** hospital *** arising 

out of pa­tient care shall be brought 

more than 2 years after the date on which 

the claimant knew, or through the use of 

reasonable diligence should have known, or 

received notice in writing of the existence

of the injury or death for which damages

are sought in the action, whichever of such

date occurs first, but in no event shall 

such action be brought more than 4 years

after the date on which occurred the act or

omission or occurrence alleged in such ac-

tion to have been the cause of such injury

or death."  735 ILCS 5/13-212(a) (West 1998).

The acts that were the basis of the seven new allega­

tions against the hospital occurred in September 1995 and Janu­ary 1996, both more than two years before the third-amended com­plaint was filed on June 25, 1998.  Plaintiffs argue the new allega­tions related back to the filing of the original complaint, while the hospital argues they do not.  Section 2-616(b) of the Code gov­

erns the concept of "relation back" and provides in rele­vant part:

"The cause of action, cross[-]claim[,] or 

defense set up in any amended pleading shall not 

be barred by lapse of time under any statute 

or contract prescribing or limiting the time 

with­in which an action may be brought or 

right asserted, if the time prescribed or 

limited had not expired when the original 

pleading was filed, and if it shall appear 

from the original and amended pleadings 

that the cause of action asserted, or the 

defense or cross[-]claim interposed in the 

amended pleading grew out of the same trans-

action or occurrence set up in the original

pleading ***."  735 ILCS 5/2-616(b) (West 1998).

As the hospital notes, the relation-back doctrine only ap­plies if (1) the original complaint was timely filed and (2) the cause of action in the amended complaint grew out of the same transaction or occurrence as that alleged in the original com­

plaint.  
Wolf v. Meister-Neiberg, Inc.
, 143 Ill. 2d 44, 46, 570 N.E.2d 327, 329 (1991).  Further, the original com­plaint should supply a defendant with all of the information necessary to pre­

pare its defense to the subsequently asserted claim.  
Flynn v. Szwed
, 224 Ill. App. 3d 107, 111, 586 N.E.2d 539, 543 (1991).  

The rationale for this rule is that a defendant will not be preju­diced so long as his attention is di­rect­ed, with­in the limi­tations period, to the facts that form the basis of the claim asserted against him.  
Zeh v. Wheel­er
, 111 Ill. 2d 266, 273, 489 N.E.2d 1342, 1345 (1986); 
Simmons v. Hendricks
, 32 Ill. 2d 489, 495, 207 N.E.2d 440, 443 (1965).  Allowing an amend­ed plead­ing to re­late back to the date the orig­inal pleadings were filed is the result of a balance struck by the legislature be­

tween the prefer­ence for resolving disputes on their merits and the preven­tion of unfair surprise or prejudice to a party result­

ing from the lack of no­tice of conduct or conditions upon which lia­bility is as­serted against it.  
Yette v. Casey's General Stores, Inc.
, 263 Ill. App. 3d 422, 425, 635 N.E.2d 1091, 1093 (1994). 

The hospital argues the original complaint and the first two amended complaints all alleged a failure on its part to implement or enforce a policy of permanent storage of radio

graphic images, while the third-amended complaint added allega­

tions of failure to properly 
read
 and/or 
interpret
 sonograms and flat plate X rays.  It contends it could not possibly have gained knowledge from the original allegation that would direct its at­

ten­tion to these new claims.  In support of its argu­ment, the hospi­tal cites cases where amendments were held not to relate back because the original allegations did not pro­vide sufficient no­tice to the defendants of the information nec­essary to defend the new allegations against them.  Those cases, howev­er, involved either sole defendants where the new claims as­serted against them were of a completely new nature that they could not have antici­

pated (
Yette
, 263 Ill. App. 3d 422, 635 N.E.2d 1091; 
Weber v. Cueto
, 253 Ill. App. 3d 509, 624 N.E.2d 442 (1993); 
Flynn
, 224 Ill. App. 3d 107, 586 N.E.2d 539; 
Bailey v. Petroff
, 170 Ill. App. 3d 791, 525 N.E.2d 278 (1988)) or multiple defen­dants where com­pletely new theories were added that had not been assert­ed against 
any
 defendants previously.  
Weidner v. Carle Foundation Hospital
, 159 Ill. App. 3d 710, 512 N.E.2d 824 (1987); 
Chestnut v. Adeli
, 131 Ill. App. 3d 24, 475 N.E.2d 260 (1985).        

In this case, however, the allegations of a failure to properly read and/or interpret sonograms and flat plate X rays was at the heart of plaintiffs' case from the beginning.  These alle­gations were not made against the hospital initial­ly, appar­

ently be­cause the medical records indicated the radio­graphic images were read or interpreted by Drs. Ambrosini and Ferry and Radio­logical Associates and not hospital personnel.  Not until after plaintiffs discovered hospital personnel ap­parently were involved in reading and/or interpreting the imag­es at issue were these alle­gations made against the hospi­tal.  Because these alle­

ga­tions were made against the hospital's codefendants and were at the heart of plaintiffs' case, the hospital was aware of them and knew the extent of the involvement of its own per­sonnel.

When the relation-back doctrine is applied, the en­tire re­cord may be exam­ined to de­ter­mine (1) if a de­fendant is on no­

tice of a claim prior to the expi­ra­tion of the statute of limi­

tations and (2) the true facts upon which the amended claim against defendant is based.  
Wolf
, 143 Ill. 2d at 46-48, 570 N.E.2d at 328-29.  Re­cently, the court in 
Cammon v. West Suburban Hospi­tal Medi­cal Center
, 301 Ill. App. 3d 939, 704 N.E.2d 731 (1998), a case in­volv­ing mul­ti­ple de­fen­dants, relied on 
Wolf
 in finding the rela­tion-back doctrine applied where an amended com­

plaint alleged West Sub­ur­ban hos­pi­tal, through its agents, had failed to achieve ade­quate hemostasis following surgery on the decedent.  Al­though the original alle­ga­tions against West Sub­ur­

ban had been for vi­car­ious liability for the reading of dece

dent's computed tomography scans, West Sub­urban had been on no­

tice from the out­set of the liti­ga­tion, prior to the expira­tion of the statute of limitations, that the plain­tiff was claiming a fail­ure to achieve adequate hemosta­sis fol­lowing sur­gery and that this was a proxi­mate cause of the decedent's death because this had been alleged against a code­fendant doctor.  Therefore, the court found the relation-back provision of section 2-616(b) ap­

plied to this new charge of neg­ligence against West Suburban.  
Cammon
, 301 Ill. App. 3d at 947-48, 704 N.E.2d at 737.  

We find the situation presented in 
Cammon
 to be very similar to that presented here.  In looking at the entire record, we find the hospital was aware from the beginning of the litiga­

tion plaintiffs were asserting negligence in reading or inter­

pret­ing sonograms on September 18, 1995, and flat plate X rays on Janu­ary 18, 1996, as this was asserted against Drs. Ambrosini and Ferry.  The sonogram and X rays were administered and taken at the hospi­tal in both instances, and the hospital was aware its per­son­nel were involved in at least the administering and taking of them if not the reading and interpretation.  We find neither prej­u­dice nor unfair surprise to the hospital in allowing the allega­tions against it in plaintiffs' third-amended complaint to relate back to the filing of the original complaint, which was clearly within the time allowed by the statute of limitations.

We find the allegations against the hospital are not time barred because they relate back to the fil­ing of the orig­i­

nal com­plaint.  We re­vers­e the trial court's grant­ing of sum­ma­ry judg­ment on those grounds, and we need not dis­cuss plaintiffs' argu­ments re­gard­ing the applica­tion of the dis­covery rule found in section 13-212(a) of the Code.  735 ILCS 5/13-212(a) (West 1998).  We express no opinion on the lack-of-proximate-cause argument advanced by defendant, because the trial court did not rule on that argument.

   Re­versed and remand­ed.

MYERSCOUGH, J., concurs.

COOK, J., specially concurs.

JUSTICE COOK, specially concurring:

I concur.

The right to amend does not depend on whether the cause of action is substantially similar to that set out in the origi­

nal pleading; the true inquiry is whether plaintiff is "'"at

tempting to slip in an entirely distinct claim in violation of the spirit of the limitations act."'"  
Steinberg v. Dunseth
, 276 Ill. App. 3d 1038, 1044, 658 N.E.2d 1239, 1245 (1995), quoting 
Sompolski v. Miller
, 239 Ill. App. 3d 1087, 1091, 608 N.E.2d 54, 57 (1992), quoting 
Simmons
, 32 Ill. 2d at 497, 207 N.E.2d at 444 (which in turn quotes the Illinois Civil Practice Act Annot., at 126-27 (1936)).  There has been a shift in focus from the iden

tity of the cause of action to the identity of the occurrence or transaction.  
Zeh
, 111 Ill. 2d at 279, 489 N.E.2d at 1348.  This transactional approach is also employed in the modern 
res
 
judica­

ta
 cases:  assertions of different theories of relief arising out of a single group of operative facts will not avoid the bar of 
res
 
judicata
.  
River Park, Inc. v. City of Highland Park
, 
184 Ill. 2d 290, 309-11, 703 N.E.2d 883, 892-93 (1998); 
cf.
 
Yette
, 263 Ill. App. 3d at 425-26, 635 N.E.2d at 1093-94 (amendment denied, where it would have changed theory from failure to remove ice to one of unnatu­ral accumulation).